EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Kenneth McClintock Hernández, Luz Z. Arce Ferrer, Jorge De Castro Font, Carlos Díaz Sánchez y Migdalia Padilla Alvelo<br><br>   Demandantes-Apelados<br><br><br>         v.<br><br><br>Thomas Rivera Schatz, en su capacidad de Secretario General, Comisionado Electoral y Oficial del Partido Nuevo Progresista y El Partido Nuevo Progresista<br><br>    Demandados-Apelantes | Certificación<br><br>2007 TSPR 121<br><br> 171 DPR ____ |

Número del Caso: CT-2007-4


Fecha: 12 de junio de 2007


Abogados de la Parte Demanda-Apelante:

                Lcdo. Félix R. Passalacqua Rivera
                Lcdo. José A. Carlo Rodríguez

Abogado de la Parte Demandante-Apelada:

                Lcda. Rubén T. Nigaglioni
                Lcdo. Verónica Ferraiuoli-Hornedo



Materia: Certificación


Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Kenneth McClintock Hernández, Luz Z. Arce Ferrer, Jorge De Castro Font, Carlos Díaz Sánchez y Migdalia Padilla Alvelo<br><br>Demandantes-Apelados<br><br>v.<br><br>Thomas Rivera Schatz, en su capacidad de Secretario General, Comisionado Electoral y Oficial del Partido Nuevo Progresista y El Partido Nuevo Progresista<br><br>Demandados-Apelantes | CT-2007-4 |

Opinión del Tribunal emitida por la Juez Asociada señora Rodríguez Rodríguez

San Juan, Puerto Rico, a 12 de junio 2007

La presente controversia requiere examinar la relación jurídica entre los partidos políticos, sus miembros afiliados y el Estado. Por un lado, se plantea como valor primario la prerrogativa del Estado de mantener el orden y buen funcionamiento del sistema electoral puertorriqueño. A la misma vez, se invoca frente a ese valor, la autonomía del partido político en el manejo de sus asuntos internos como manifestación del derecho de libre asociación. De otra parte, los miembros afiliados del partido reclaman, como contrapeso a las acciones disciplinarias de su partido, las protecciones que les brinda la Ley Electoral de Puerto Rico.

Nos corresponde, por tanto, sopesar con cautela los intereses involucrados en esta controversia, los cuales como se puede apreciar, se revelan fundamentales para nuestro sistema electoral y por ende nuestra democracia.

**I**

Recurren ante nosotros mediante auto de certificación el licenciado Thomas Rivera Schatz en su capacidad de Secretario General, Comisionado Electoral y Oficial del Partido Nuevo Progresista, y el Partido Nuevo Progresista (PNP) como agrupación política. En esencia, solicitan que revoquemos la sentencia del Tribunal de Primera Instancia, dictada el 8 de mayo de 2007, en la cual dicho foro declaró nulas las sanciones impuestas por los organismos rectores del PNP a los demandantes, miembros de dicho partido, por violaciones al debido proceso de ley y al Reglamento del PNP.

El tribunal de instancia ordenó al licenciado Rivera Schatz a reintegrar a los demandantes como miembros afiliados del PNP y prohibió, mediante orden de interdicto, que los oficiales de dicho partido obstruyeran el ejercicio de los derechos que cobijan a los demandantes como afiliados del PNP, tales como su derecho a postularse como candidatos a puestos electivos bajo la insignia de dicho partido en el proceso de primarias electorales. Posteriormente, en una Sentencia enmendada *Nunc Pro Tunc*, el tribunal de instancia añadió que "[c]ualquier certificación de candidatos o procedimientos que se desvíe

de los términos, órdenes, prohibiciones y demás pronunciamientos de esta Sentencia 'carecerá de toda eficacia y será nulo a todo efecto legal.'"

Los demandantes en este caso fueron electos senadores bajo la insignia del Partido Nuevo Progresista en los comicios electorales celebrados en Puerto Rico el 2 de noviembre de 2004. Los honorables Kenneth McClintock Hernández, Luz Z. Arce Ferrer y Jorge De Castro Font son senadores por acumulación, el honorable Carlos Díaz Sánchez es senador por el Distrito número I de San Juan y la honorable Migdalida Padilla Alvelo es senadora por el Distrito número II de Bayamón. Como resultado de un conflicto interno en el partido, el PNP les impuso diversas sanciones disciplinarias a los demandantes que, como veremos, en algunos casos culminaron en su expulsión como miembros del partido y en otros, en la prohibición de aspirar a cargos electivos por el PNP en los próximos comicios electorales.

El 7 de junio de 2005, a raíz de unas expresiones hechas por el senador De Castro Font en la Asamblea de Delegados del PNP del 15 de mayo de 2005, se presentó una querella ante el Directorio del PNP contra dicho senador. Luego de considerar la querella, el Directorio del PNP declaró al senador De Castro Font persona *non grata* del partido; lo destituyó de toda posición de liderato; lo suspendió sumaria y permanentemente como miembro del partido; le prohibió participar en los organismos del PNP;

y recomendó a la Junta Estatal o a la Asamblea de Delegados su expulsión del partido. Mediante carta preparada el 8 de junio de 2005, el licenciado Rivera Schatz le informó al senador De Castro Font sobre las sanciones impuestas y le concedió un término de cinco días para apelar de dicha determinación al Directorio.

Oportunamente, el senador De Castro Font apeló de la determinación del Directorio del PNP e indicó, en síntesis, que no se le proveyó oportunidad alguna de enfrentarse a la querella presentada en su contra antes de la imposición de las sanciones y que la determinación de imponerle sanciones se tomó en violación a su debido proceso de ley y a su derecho a la libre expresión.

En una reunión celebrada el 1ero de julio de 2005, el Directorio del PNP declaró no ha lugar la solicitud de apelación del senador De Castro Font y confirmó las sanciones impuestas. El 5 de julio de 2005, el licenciado Rivera Schatz le notificó al senador De Castro Font que el 14 de agosto de 2005 la Asamblea General consideraría su expulsión del PNP conforme a la recomendación del Directorio.[1]

Por otra parte, en esa misma fecha, el licenciado Rivera Schatz presentó una querella ante el Directorio del PNP en contra de los senadores Kenneth McClintock

---

[1] El 7 de julio de 2005, el senador De Castro Font presentó una "Dúplica a réplica a escrito de apelación y solicitud de vista", en la que reiteró su solicitud para que se dejaran sin efectos las sanciones impuestas y se le concediera una vista para argumentar ante el partido y presentar prueba a su favor.

Hernández, Luz Z. Arce Ferrer, Carlos Díaz Sánchez, Migdalida Padilla Alvelo y Orlando Parga Figueroa. En esa querella se les imputó: "haber desafiado [a] los organismos rectores del partido, a saber, [l]a Asamblea General de Delegados, el Directorio y el propio Caucus del Partido en el Senado." *Véase* apéndice del escrito de certificación, pág. 103. Además, se indicó que los senadores querellados no habían "tenido deferencia o respeto alguno por el electorado que lo[s] eligió como senadores, discutiendo públicamente asuntos del Partido y distanciándose de las decisiones de la colectividad." *Id.*

En esta reunión del 1ero de julio de 2005, el Directorio del PNP declaró a los senadores querellados incursos en violaciones al Reglamento del PNP y a las determinaciones de los organismos rectores del partido; los relevó de toda posición de liderato en el partido; los suspendió sumaria y permanentemente como miembros del partido; les prohibió participar en los organismos del PNP; y les prohibió figurar como candidatos bajo la insignia del PNP.[2] En sendas comunicaciones preparadas el 5 de julio de 2005, el licenciado Rivera Schatz informó a los senadores querellados que tendrían cinco días para apelar al Directorio y que las sanciones sólo serían revisables por la Asamblea General de Delegados.

---

[2] El 14 de agosto de 2005 el Partido Nuevo Progresista ("PNP") aprobó un nuevo Reglamento e incluyó de forma expresa esta sanción disciplinaria que le permite prohibirle a un miembro afiliado figurar como candidato bajo la insignia del PNP. *Véase* Art. 98, Reglamento PNP del año 2005.

El 8 de julio de 2005, los senadores querellados presentaron un alegato ante el Directorio del PNP en el que, en síntesis, negaron haber cometido las faltas imputadas, indicaron que el partido no podía imponerles sanciones bajo el palio del artículo 8 del Reglamento del PNP puesto que ellos no eran oficiales de dicha asociación e indicaron que el organismo apropiado para dilucidar la querella presentada en su contra era el Comité de Conciliación creado en el artículo 54 del Reglamento del PNP. Finalmente, adujeron que al imponerle las sanciones apeladas, el PNP violentó su derecho al debido procedimiento de ley.[3]

En respuesta a la apelación presentada por los senadores querellados, el licenciado Rivera Schatz le notificó a éstos que se les había concedido una vista en la que tendrían la oportunidad de presentar prueba ante la Asamblea General del partido. Dicha vista se celebraría el 14 de agosto de 2005. Ninguno de los senadores querellados acudió a la vista pautada para el 14 de agosto. En esa fecha, la Asamblea General expulsó del partido al senador de Castro Font y confirmó las sanciones impuestas a los senadores McClintock Hernández, Arce Ferrer y Díaz Sánchez y Padilla Alvelo. Además, la Asamblea General adoptó un

---

[3] El 8 de julio de 2005, el senador Carlos Díaz Sánchez presentó un alegato suplementario ante el Directorio del PNP en el que amplió las alegaciones sobre violación al debido proceso de ley y reiteró no haber cometido las faltas imputadas.

nuevo Reglamento para regir los procedimientos internos del PNP.

Posteriormente, el 7 de marzo de 2006, el licenciado Rivera Schatz presentó una nueva querella en contra de los senadores aquí demandantes[4] en la que indicó que los querellados habían "mantenido el desafío a los organismos rectores del partido…[;] y traicionado los postulados … [del] Partido…." En esta querella, el licenciado Rivera Schatz recomendó la expulsión de los senadores McClintock y Parga del partido y la imposición de una censura enérgica a los senadores Arce Ferrer, Díaz Sánchez y Padilla Alvelo. Invocando los artículos 8 y 97 del Reglamento del PNP, el licenciado Rivera Schatz indicó que se podría tramitar la querella de forma expedita. El 8 de marzo de 2006 el licenciado Rivera Schatz le informó al senador McClintock de la determinación del Directorio, a petición de la Asamblea General del partido, de expulsarlo del PNP, y le concedió cinco días para "solicitar audiencia ante la Asamblea General para defenderse de las alegaciones … en su contra."[5]

El 13 de marzo de 2006, el senador McClintock le cursó una carta al licenciado Rivera Schatz en la que respondió a

---

[4] También figuró como querellado el senador Orlando Parga Figueroa quien, sin embargo, no se unió a la presente demanda.

[5] Específicamente, el licenciado Rivera Schatz le notificó al Senador McClintock que en la reunión del Directorio celebrada el 7 de marzo de 2006, "se determinó su expulsión del Partido Nuevo Progresista, luego de atender la solicitud de la Asamblea General Celebrada en Toa Baja." Apéndice al recurso de certificación, pág. 220.

las alegaciones contenidas en la querella y negó las violaciones imputadas. En contestación, el Secretario del PNP le informó que su escrito sería acogido como una apelación que se atendería en la próxima reunión de la Asamblea General. Mediante misiva con fecha del 21 de marzo de 2006, el senador McClintock solicitó que se tratara el asunto ante el Comité de Conciliación. El licenciado Rivera Schatz rechazó esta última solicitud e indicó que la Asamblea General era el cuerpo con potestad para tramitar la apelación presentada por McClintock.

El 10 de agosto de 2006, el licenciado Rivera Schatz citó al senador McClintock a comparecer a la Asamblea General del Partido que se celebraría el 20 de agosto de 2006. Le indicó que en dicha Asamblea se le permitiría argumentar y presentar prueba a su favor. Mediante misiva con fecha del 11 de agosto de 2006, el senador McClintock informó que no asistiría a la Asamblea General del 20 de agosto de 2006. Indicó que dicho procedimiento no cumplía con los postulados básicos del debido proceso de ley requerido por la Ley Electoral de Puerto Rico.

Así las cosas, los senadores demandantes no acudieron a la Asamblea General el 20 de agosto de 2006, en la cual dicho organismo discutió las sanciones recomendadas y las confirmó. Mediante certificación del 29 de marzo de 2007, el licenciado Rivera Schatz acreditó que el partido había expulsado de dicha colectividad a los senadores De Castro Font, McClintock Hernández y Parga Figueroa. Además,

acreditó que las senadoras Arce Ferrer y Padilla Alvelo y el senador Díaz Sánchez no podrían figurar como candidatos bajo la insignia del partido, ni ocupar posiciones de liderato en el PNP.

El 29 de marzo de 2007, los senadores McClintock Hernández, De Castro Font, Arce Ferrer, Díaz Sánchez y Padilla Alvelo presentaron una petición de interdicto preliminar y permanente ante el Tribunal de Primera Instancia. Alegaron que las sanciones impuestas eran nulas y contrarias a la Ley Electoral. Además, indicaron que las acciones disciplinarias de los partidos deben cumplir con los preceptos del debido procedimiento de ley y que el PNP había violentado dichas garantías que la Ley Electoral dispone protegen a los electores afiliados a un partido.

El 10 de abril de 2007, el PNP presentó una moción de desestimación y/o sentencia sumaria. En dicha moción adujo que el mecanismo de interdicto no era el adecuado para revisar la imposición por un partido político de una medida disciplinaria en contra de uno de sus miembros; que los demandantes no probaron que sufrirían un daño irreparable de no concederse el remedio de interdicto; y que estaban impedidos de proseguir su acción debido a su falta de diligencia y en virtud de la doctrina de incuria. Sobre la utilización del recurso de interdicto para solicitar la revisión de las medidas disciplinarias impuestas, indicó que dicho reclamo era improcedente pues los demandantes

debieron presentar un recurso ordinario de revisión judicial.

Luego de celebrar una vista el 12 de abril de 2007, en la que el foro primario tuvo la oportunidad de escuchar los argumentos de las partes aquí en litigio, el 8 de mayo de 2007 el Tribunal de Primera Instancia dictó sentencia sumaria en la que, como indicamos, declaró con lugar la demanda y concedió el remedio de interdicto solicitado por los demandantes. En esa misma fecha, el tribunal de instancia declaró no ha lugar la moción de desestimación o sentencia sumaria presentada por la parte demandada. En su sentencia, el foro primario determinó que el PNP violó las disposiciones de su Reglamento sobre el procedimiento a seguir al imponer sanciones disciplinarias a sus miembros; privó a los demandantes de un debido procedimiento de ley en la tramitación de las querellas; privó a los demandantes de su derecho a disentir de los acuerdos del partido que no se refieren a asuntos programáticas; y de su derecho a postulares a cargos electivos bajo la insignia del PNP.

En desacuerdo, el 17 de mayo de 2007 los demandados, aquí peticionarios, presentaron un escrito de apelación ante el Tribunal de Apelaciones y a la misma vez, una solicitud de certificación ante nosotros. El 22 de mayo de 2007 expedimos el auto de certificación y le concedimos un término simultáneo a las partes para presentar sus respectivos alegatos. Con el beneficio de los alegatos de las partes procedemos a resolver.

**II**

**A**

Tenemos ante nuestra consideración una controversia novedosa, donde se nos requiere analizar el alcance de la facultad de un partido político para disciplinar a sus miembros. Así como también, la facultad de la Asamblea Legislativa para, mediante legislación, regular algunos aspectos de ese proceso disciplinario. No menos importante y como asunto de umbral, debemos plantearnos la naturaleza de nuestra intervención en lo que es, en su esencia, un álgido conflicto intra-partidista.

Para adecuadamente atender estas controversias, reseñaremos inicialmente algunos principios rectores referentes a nuestro ordenamiento electoral. Algunos de los cuales son de índole constitucional y otros de carácter estatutario, todos los cuales inciden de una forma u otra sobre la controversia a la que hoy nos enfrentamos.

**B**

Nuestra democracia representativa es la piedra angular de nuestra vida colectiva como pueblo. Así lo recoge diáfanamente el Preámbulo de la Constitución, al enfatizar el carácter democrático de nuestra sociedad, donde el orden político emana del pueblo y se ejerce con arreglo a la voluntad manifiesta en las urnas. Elementos básicos de este proceso democrático son, necesariamente, los partidos políticos porque son éstos los mecanismos mediante los cuales se canaliza el ejercicio del sufragio de los

ciudadanos, viabilizando la elección periódica del gobierno del país.[6]   Son, como hemos dicho, "[los] vehículos de la voluntad electoral."   *P.A.C. v. P.I.P.*, res. 29 de diciembre de 2006, 163 D.P.R. ___, 2006 TSPR 193.   Todo ello claro está, cimentado en el derecho al voto consagrado expresamente en la Carta de Derechos.   Constitución del Estado Libre Asociado de Puerto Rico, Art. II, Sec. 2, L.P.R.A., Tomo I.   Derecho que comprende no solo votar en los eventos electorales, sino también el derecho a formar agrupaciones políticas para participar en estos eventos electorales.   *P.A.C. v. E.L.A. I,* 150 D.P.R. 359, 372 (2000).

La Constitución del Estado Libre Asociado de Puerto Rico reconoce expresamente la función de los partidos políticos en la organización de nuestro sistema de gobierno.   De ahí que se establezca constitucionalmente la fórmula de garantía de representación minoritaria en la Asamblea Legislativa.   Constitución del Estado Libre Asociado de Puerto Rico, Art. III, Sec. 7, L.P.R.A., Tomo I.

La Asamblea Legislativa tiene la encomienda constitucional de promulgar "las leyes [que] garantizarán la expresión de la voluntad del pueblo mediante el sufragio universal … y protegerán al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral."

---

[6] *Véase* M. Pabón, *Los derechos y los partidos políticos en la sociedad puertorriqueña*, Ediciones Edil, Río Piedras Puerto Rico, (1968), págs. 103, 111.

Constitución del Estado Libre Asociado, Art. II, Sec. 2, L.P.R.A., Tomo I. Además, la Constitución facultó a la Asamblea Legislativa a regular el proceso eleccionario al proveer que "se dispondrá por ley todo lo concerniente al proceso electoral y de inscripción de electores, así como lo relativo a los partidos políticos y candidaturas." Constitución del Estado Libre Asociado, Art. VI, sec. 4, L.P.R.A., Tomo I. Véase, *Diario de Sesiones de la Convención Constituyente*, 1961, T. 2, págs. 1402-1403, T. 3 pág. 2074, T. 4, pág. 2621. Por lo tanto, la facultad de la Asamblea Legislativa para regular el proceso electoral así como los partidos, tiene una insoslayable dimensión constitucional.

En atención a ese mandato constitucional, la Asamblea Legislativa promulgó la Ley Electoral de Puerto Rico, Ley Núm. 4 de 20 de diciembre de 1977, según enmendada, 16 L.P.R.A. secs. 3001-3380. A poco que se analice el andamiaje provisto en esta ley, nos percatamos que la misma le reconoce un rol primordial y sustancial a los partidos políticos. La Comisión Estatal de Elecciones, creada en virtud de la Ley Electoral, tiene una estructura básica administrativa y decisional que le impone a los partidos políticos la responsabilidad de estructurar e inspeccionar todos los procedimientos de naturaleza electoral. Véase, *Granados v. Rodríguez Estrada I*, 124 D.P.R. 1, 21 (1989). Hemos reconocido por lo tanto, que son los partidos políticos quienes ejercen "el control efectivo primario del

sistema electoral." *P.S.P. v. C.E.E.*, 110 D.P.R. 400, 410 (1980). De otra parte, la Ley Electoral le provee a los partidos anualmente --tanto en año electoral como no electoral-- una subvención económica significativa para sufragar sus gastos operacionales.[7]

Al delegar en los partidos políticos la importante y delicada encomienda de velar por el eficaz manejo del aparato electoral, considerando que éstos desempeñan una función pública al presentar candidatos a puestos públicos y formular programas de administración y tomando en cuenta que el gobierno contribuye económicamente al mantenimiento de los partidos, es razonable concluir que en Puerto Rico, los partidos políticos son, en estos extremos, entes cuasi-gubernamentales.[8] Reiteradamente nos hemos expresado de

---

[7] La relación simbiótica Estado/partido, se manifiesta a través de las asignaciones económicas que el Estado provee anualmente. Así, los partidos políticos reciben del Fondo Electoral, creado en virtud de la Ley Electoral, la cantidad de $300,000.00 en cada año no electoral y $600,000.00 en año de elecciones generales, **para sufragar con estos dineros sus operaciones ordinarias**. 16 L.P.R.A. sec. 3116. En el año electoral, el partido que se acoja al Fondo Electoral tiene derecho a recibir una asignación base de $3,000,000.00 y una asignación progresiva de hasta $4,000,000.00, para sufragar con estos fondos sus gastos de campaña del partido y su candidato a gobernador. 16 L.P.R.A. sec. 3117(c). Para una discusión general, véase, Anderson, La Ley Electoral, en R. Anderson (coordinador), *Política Electoral en Puerto Rico*, Editorial Plaza Mayor, Río Piedras, 1998, págs. 59, 80-81.

[8] El profesor Tribe, en su tratado de Derecho Constitucional, señala acertadamente lo siguiente:

Political parties exhibit many of the attributes of ordinary voluntary associations and yet seem imbued with a cuasi-governmental character. While this hybrid aspect of political parties have left uncertain the extent to which constitutional strictures bind their conduct, it

forma análoga.  Véase, *P.A.C. v. P.I.P., supra; P.A.C. v. E.L.A., I, supra*, pág. 372; *P.R.P. v. E.L.A.,* 115 D.P.R. 631, 638 (1984); *P.S.P. v. E.L.A,* 107 D.P.R. 590, 610 (1978); *Fuster v. Busó*, 102 D.P.R. 327 (1974).  Y es que por disposición de ley y al amparo del mandato constitucional, los partidos políticos han quedado investidos de funciones y poderes gubernamentales de la más alta jerarquía.

Como resultado de lo anterior, la Asamblea Legislativa puede regular aquellos procesos internos de los partidos políticos que incidan directamente sobre el proceso electoral y el derecho de los electores.  Como hemos dicho, "la Asamblea Legislativa tiene una amplia facultad y un amplio margen de autoridad para legislar en asuntos de materia electoral y regular el proceso electoral." *P.A.C. v. P.I.P.*, *supra*.  Véase además, R. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico*, Vol. II, Colegio de Abogados de Puerto Rico, Instituto de Educación Práctica, Inc., 2003, págs. 1205-1206.  Por otro lado, este carácter cuasi-gubernamental le impone a los partidos políticos la obligación de respetar y garantizar las

---

is clear that **to the extend the law delegates to political parties roles that fit significantly into official electoral or other governmental processes, their claims to private autonomy necessarily begin to give way not only to governmental regulatory power, but also to direct application of federal constitutional norms.**

L. H. Tribe, *American Constitutional Law*, second edition, New York, Foundation Press, 1988, sec. 13-23, pág. 1118. Véase además, Anderson, *op. cit.*, pág. 81.

prerrogativas electorales de sus afiliados, pues sus actuaciones quedan matizadas por lo que puede considerarse acción del Estado. L. H. Tribe, *American Constitutional Law*, Foundation Press, New York, second edition, 1988, sec. 13-23, pág. 1118. *Véase a modo ilustrativo*, *Smith v. Allwright*, 321 U.S. 649 (1944).

En este contexto, queda clara nuestra facultad para intervenir en esta disputa como garante de los derechos que le asisten tanto a los partidos políticos frente al Estado, como a los electores frente a su partido y al Estado. Este último, al reglamentar el proceso electoral impone, necesariamente, cargas sobre el derecho a participar en estos eventos, por lo que debemos cerciorarnos que los gravámenes impuestos no incidan injustificadamente sobre los derechos de cada cual. A fin de cuentas, una de las principales funciones de la revisión judicial es precisamente la remoción de obstáculos en el proceso democrático.[9]

### III

En aras de salvaguardar la integridad del proceso electoral puertorriqueño, la Ley Electoral enuncia varios derechos y prerrogativas de todo elector afiliado, los cuales tienen "prevalencia … sobre los derechos y

---

[9] Sobre este particular, el profesor John Hart Ely expresa en su obra principal, *Democracy and Distrust*, Harvard University Press, Cambridge, 1980, pág. 117, lo siguiente: "It should be clear . . . [that] unblocking stoppages in the democratic process is what judicial review ought preeminently be about, and denial of the vote seems the quintessential stoppage."

prerrogativas de todos los partidos y agrupaciones políticas." 16 L.P.R.A. sec. 3051. Entre éstos se destaca "[e]l derecho del elector afiliado aspirante a una candidatura a solicitar primarias de su partido y la celebración de las mismas con arreglo a las garantías, derecho y procedimientos establecidos en [la Ley Electoral]." 16 L.P.R.A. secs. 3051(8).[10]

En el presente caso, el PNP le prohibió a las senadoras Arce Ferrer, Padilla Alvelo y al senador Díaz Sánchez, postularse como candidatos bajo la insignia del PNP, sanción que les impide participar en el procedimiento de primarias del Partido. Como cuestión de umbral, y con independencia del procedimiento seguido, debemos atender la

---

[10] Del historial legislativo de la medida que estableció la Declaración de Derechos y Prerrogativas del Elector se desprende que su objetivo fue garantizar al máximo el libre ejercicio de la expresión electoral. En tal sentido, del debate legislativo surge lo siguiente:

> [L]a Reforma Electoral es para proveer el proceso de expresión del ciudadano, para garantizar que esa expresión alcance los niveles más altos de pureza. Es para canalizar que esa voz del pueblo, acumulada en las garantías de tantos compatriotas, no se perjudique en lo que sea, en lo que quiere. . . El voto es una directriz para que se ejecute un programa y una obra. Ese sistema que el gobierno tiene la obligación de proveerle al ciudadano, debe garantizar esa expresión. No debe ser un sistema para una protección indebida de unos partidos políticos. El partido no es nada más que un instrumento que el ciudadano organiza para canalizar unas ideas. El partido es lo que aglutina en forma global, un mecanismo que le permite al ciudadano canalizarse, hacer su expresión y formarse un gobierno. Pero el partido no es dueño de la voluntad del elector; el partido no es la conciencia del ciudadano.

*Diario de Sesiones*, 1971, vol. XXVII, núm. 18, pág. 192.

validez de esta sanción frente a las disposiciones de la Ley Electoral que, como vimos, le confieren a los electores afiliados a un partido derecho a solicitar primarias de éste.  16 L.P.R.A. secs. 3051, 3156.

Pasemos entonces a analizar con detenimiento la validez sustantiva de la sanción impuesta.

## A

En toda democracia representativa el elector goza de un derecho a asociarse libremente para adelantar su ideología política y participar en el proceso electoral, proponiendo candidatos a puestos electivos que reflejen su particular ideología y visión de gobierno.  El derecho del elector a asociarse a un partido puede a su vez confligir con el derecho del partido, como asociación, de regir sus asuntos internos y escoger a sus miembros.  Ello, en vista de que los partidos como organizaciones que operan sobre la base de los derechos individuales de sus miembros, poseen derechos constitucionalmente protegidos.  *Véase,* Stokes, *When Freedoms Conflict:  Party Discipline and the First Amendment*, 11 Journal of Law and Politics 751, 775 (1995). Reconocemos que los partidos, para adecuadamente adelantar sus objetivos, están facultados para identificar quiénes deben formar parte de su membresía, así como deben tener la potestad de disciplinar y expulsar a quienes se aparten de sus criterios de asociación.[11]

---

[11] *Véase a modo ilustrativo, Democratic Party of United States v. Wisconsin ex rel. LaFollete,* 450 U.S. 107, 122 (1981); *Tashjian v. Republican Party of Connecticut,* 479

No hay duda entonces que puede existir, como en efecto existe, un cierto grado de tensión entre los intereses del partido y los del ciudadano, elector afiliado de un partido.  Cuando se configure tal conflicto en el ámbito electoral, estamos llamados a considerar el valor principal tutelado por la Ley Electoral de proteger el derecho del ciudadano a expresarse mediante el voto.  *Véase, nota al calce 10*.

El PNP aduce que el derecho a libre asociación impide que el Estado se inmiscuya con su decisión de quiénes pueden ser sus miembros y quiénes pueden aspirar a cargos públicos bajo su insignia.  Como corolario esencial de su derecho a la libre asociación, entiende que tiene la potestad de determinar quién puede ser considerado para ser nominado por su partido como candidato, de cara a unas elecciones generales.  En virtud de lo cual el PNP concluye que posee entera autonomía frente al Estado para excluir a las senadoras Arce Ferrer y Padilla Alvelo y al senador Díaz Sánchez del proceso de primarias.

Los argumentos esgrimidos por el PNP deben ser analizados en el contexto del propósito expreso de la Ley Electoral de garantizar al máximo el libre ejercicio de la expresión ciudadana, canalizado, entre otras disposiciones, a través de lo dispuesto en el artículo 4.006 de la Ley Electoral.    Este  artículo  expresamente  dispone  que

_____

U.S. 208, 224 (1986) ("The Party's determination of the boundaries of its own association, and of the structure which best allows it to pursue its political goals, is protected by the Constitution.")

cualquier "elector miembro de un partido político **tendrá derecho a que se le considere para ser nominado por su partido como candidato a cualquier cargo electivo objeto de votación en unas elecciones.**" (Énfasis nuestro.) 16 L.P.R.A. sec. 3156. Y que **"ninguna disposición reglamentaria del partido podrá violar este derecho."** (Énfasis nuestro.) *Id.* El partido político viene entonces obligado a participar en un proceso primarista cuando surja más de un aspirante idóneo para un cargo. *Id.* Además, y como vimos antes, la Declaración de Derechos y Prerrogativas de los Electores le reconoce a todo elector afiliado el derecho de aspirar a una candidatura y solicitar primarias en su partido. 16 L.P.R.A. sec. 3051(8).

Resulta evidente que los reclamos de autonomía del PNP para excluir a las senadoras Arce Ferrer, Padilla Alvelo y al senador Díaz Sánchez, están en aparente conflicto con las disposiciones de la Ley Electoral. Ya habíamos advertido en *P.A.C. v. E.L.A. I, supra*, pág. 373, que la facultad y obligación de la Asamblea Legislativa de regular el proceso electoral "tiene el efecto de restringir e imponer cargas sobre el derecho a participar en el proceso electoral." Entonces, al evaluar la postura del PNP sobre este asunto debemos determinar si la Ley Electoral persigue un interés legítimo y cuál es la naturaleza de la intromisión de la ley en las prerrogativas del partido como

asociación a la luz de los intereses tutelados por dicha ley.[12]

**B**

Iniciamos nuestra discusión reafirmándonos en nuestras anteriores expresiones en el sentido que aun cuando el derecho al voto y a la asociación son de carácter fundamental, y su ejercicio conlleva necesariamente el derecho a votar de una manera y por un candidato particular, "el derecho a ser candidato a un cargo electivo, así como el de comparecer como asociación en la papeleta electoral, no son derechos fundamentales." *P.A.C. v. E.L.A., I, supra*, pág. 387. Véase, *García v. Luciano*, 115 D.P.R. 628, 630 (1984).

Ello no quiere decir claro está, que los candidatos estén desprovistos de protección o derechos. Ya vimos como la Ley Electoral le reconoce al elector afiliado de un partido el derecho a que su partido le considere para ser nominado a un puesto electivo y a solicitar la celebración de primarias de su partido. *Véase,* 16 L.P.R.A. secs. 3156, 3051(8).[13]

---

[12] Debemos recalcar, que no se ha cuestionado en este caso la validez constitucional de ninguna de las disposiciones de la Ley Electoral de Puerto Rico.

[13] Cabe destacar, que bajo nuestro ordenamiento, aun cuando las primarias son eventos partidistas donde se determina quiénes habrán de concurrir a una elección general bajo la insignia de un partido político, es la Comisión Estatal de Elecciones el ente que tiene a su cargo dirigir y supervisar todo el procedimiento. Véase, capítulo 307 de la Ley Electoral, 16 L.P.R.A. secs. 3151 *et seq.* Es decir, la Comisión está inmersa de lleno en los procesos de primarias, desde poner en vigor las reglamentaciones aprobadas por los partidos para estos procesos (claro,

Estas disposiciones reflejan la estimación del legislador, sobre la importancia que tiene para nuestro sistema de gobierno, la elección de candidatos mediante el ejercicio del voto en el proceso de primarias. Los partidos políticos son el soporte de nuestra democracia representativa. En ese contexto, "[s]u organización y estructura interna tienen un impacto importante en las ejecutorias de un gobierno eficiente que formule y administre una política pública definida." Rivera Hernández, "Las primarias: ¿mecanismo democrático?" en R. Anderson (coordinador), *Política Electoral en Puerto Rico*, Editorial Plaza Mayor, Inc., Río Piedras, 1998, págs. 149-150. En virtud de esta razón, existe una relación directa entre la elección de los candidatos y la eficacia política del gobierno. Véase además, Meléndez, Partido y elecciones, en R. Anderson, *op. cit.*, págs. 132-138.

Los procesos primaristas deben entenderse como el mecanismo más apropiado para avanzar en la democratización de la vida pública y hacer más transparente la toma de decisiones colectivas que habrán de afectar al país. Las primarias rompen con la disciplina férrea que los partidos le imponen a sus militantes, fomentan la introducción de ideas nuevas en el foro público, adelantan el debate

_____

mientras no conflijan con la Ley Electoral), como determinar la fecha en que se celebrarán, hasta diseñar e imprimir las papeletas, etc. Véase, Anderson, *op. cit.*, págs. 73-75.

político, y aseguran una mayor igualdad del elector.[14]  Con lo cual, se ha señalado que:  "Las primarias directas constituyen un procedimiento de designación que tiene como intención principal sustraer los poderes de nombramiento a la maquinaria política de los dirigentes y entregárselos al pueblo para que éste los ejerza en la forma más directa posible."  *La Nueva Constitución de Puerto Rico*, Ed. Universidad de Puerto Rico, Río Piedras, 2005, pág. 332. Véase además, Anderson, La Ley Electoral en R. Anderson, *op. cit.*, págs. 59, 73-75.

Asimismo, no podemos olvidar que "[e]n nuestro sistema constitucional el derecho al voto no tan sólo comprende el derecho del elector a votar en las elecciones [generales], sino que abarca el derecho a que se incluyan en las papeletas las opciones que reflejan las corrientes

---

[14] El proceso primarista no está exento de críticas, pues entre otras cosas, conlleva gastos adicionales para los partidos y genera problemas de unidad dentro de los mismos. Véase, Anderson, *op. cit.*, págs. 73-75; R. Serrano Geyls, R. Rexach Benítez, *Un sistema de elecciones primarias para Puerto Rico*, Ed. Universidad de Puerto Rico, San Juan, 1955.  Ese inconveniente, de claro matiz político, fue sopesado ya por el legislador al aprobar la Ley Electoral bajo los términos discutidos.  Parece evidente que pesó más el interés público de democratizar el proceso nominativo y ampliar la participación de los electores afiliados en las decisiones fundamentales de los partidos, que cualquier otra consideración.  Véase, Acevedo, Los procesos de nominación de candidatos, en *Comisión Especial de Revisión del Proceso Electoral*, 1982, Apéndice 16, págs. 331 *et seq.* Véase además, Informe al Senado de Puerto Rico de la Comisión de Gobierno sobre el P. del S. 719, 1984, pág. 16. ("Ni la Comisión especial, ni nosotros creemos propio eliminar el mecanismo de primarias.  La Comisión no consideró conveniente para nuestra salud democrática la eliminación… Es nuestro propósito firme el mantener la primaria como mecanismo predilecto.")

políticas contemporáneas…" *P.A.C. v. E.L.A., I, supra,* pág. 372. Por lo tanto, la democratización del proceso de primarias y el acceso de todo miembro del partido al mismo adelanta el interés que los resultados de este proceso representen las opciones de preferencia del electorado afiliado. Permiten que sea el elector, mediante el voto directo, quien controle lo que será la agenda de gobierno. R. Dahl, *On Democracy*, Yale University Press, New Haven, 2000, cap. 8. La imposibilidad de participar en este proceso representa la inhabilidad del electorado afiliado de apoyar un candidato, coartando la expresión de la voluntad del elector. Este daño que sufre el elector no se subsana con la posibilidad de votar en las elecciones generales, pues en ese momento sólo el candidato que resultara victorioso en el proceso de primarias figura en la papeleta.[15]

En atención a lo anterior, entendemos que al asegurar que todo elector afiliado del partido tenga acceso al proceso de primarias, la Ley Electoral pretende proteger el derecho de todo elector a votar de forma efectiva, además que propende a un sistema electoral justo y honesto. La

---

[15] Somos conscientes que las primarias no son siempre necesarias, imprescindibles o compulsorias pues como sabemos, en ocasiones, sólo hay un candidato idóneo disponible para una posición electiva, bien porque sólo una persona esté interesada o bien porque se ha logrado un consenso sobre quién deba ser el candidato, por lo que no hay necesidad de celebrar las mismas. La ley lo que tutela es que el elector afiliado tenga derecho a solicitar de su partido que se le considere para ser nominado como candidato. Véase además, artículo 4.006A de la Ley Electoral, 16 L.P.R.A. sec. 3156a, donde se estatuye el llamado "método alterno", para seleccionar candidatos.

Ley Electoral no pretende determinar quién debe ser el candidato que represente al Partido en las elecciones generales; no reglamenta el procedimiento mediante el cual el partido elige los oficiales que controlan su funcionamiento interno;[16] no coarta la libertad del partido de endosar al candidato de su preferencia en el proceso de primarias;[17] y tampoco incide en la facultad del partido de decidir quiénes tendrán acceso a votar en la primaria.[18] La disposición de la Ley Electoral lo único que hace es abrir las puertas del partido a un amplio proceso de participación y de expresión en el cual el elector será

---

[16] Esto, a diferencia de *EU Secretary of State of California v. San Francisco County*, 489 U.S. 214, 224 (1989) en donde el Tribunal Supremo federal invalidó ciertas disposiciones del Código Electoral del Estado de California que prohibían a los partidos endosar candidatos en las primarias, por infringir la libertad de expresión del Partido.

[17] Esta situación se distingue de los hechos a los que se enfrentó el Tribunal Supremo federal en *EU Secretary of State of California v. San Francisco County*, *supra,* en donde dicho Foro resolvió que las disposiciones del Código Electoral de California violentaban la libertad de asociación del partido al reglamentar la organización interna y la composición oficial de los organismos rectores del partido.

[18] En *Democratic Party v. Wisconsin*, *supra,* y *Tashjian v. Republican Party of Connecticut*, *supra*, el Tribunal sostuvo la primacía de las prerrogativas de los partidos ante estatutos que le impedían al Partido decidir si abría o no el procedimiento de primarias a individuos no-afiliados. En *Democratic Party v. Wisconsin, supra,* el Tribunal Supremo federal resolvió que el Estado de Wisconsin no podía obligar a ciertos delegados electos en una primaria abierta a votar según los resultados de la primaria en la convención nacional del partido y en *Tashjian v. Republican Party of Connecticut*, *supra*, dicho Tribunal invalidó un estatuto del Estado de Connecticut que obligaba al Partido Republicano a realizar primarias cerradas cuando las Reglas de dicho partido permitían que individuos no afiliados (e.g., electores independientes) al partido participaran en dicho proceso. Véase *c.f., Clingman J. Beaver*, 544 U.S. 581 (2005).

quien, luego de ejercer su derecho al voto, determinará quiénes podrán aspirar a ser candidatos de su colectividad en unas elecciones generales. En fin, las exigencias de la Ley Electoral en torno al proceso de primarias no son irrazonables y su intromisión en las prerrogativas del Partido es mínima.

A tenor con los principios antes esbozados, y ante la primacía que le reconoce la Ley Electoral al procedimiento de primarias, el PNP no puede utilizar su facultad de disciplinar a sus electores afiliados como un subterfugio para coartar el derecho del miembro elector a solicitar primarias de su partido. *Véase* Artículo 4.006 de la Ley Electoral, 16 L.P.R.A. sec. 3156.[19] Resolvemos entonces que, a la luz de los hechos en este caso, la sanción impuesta por el PNP a las senadoras Arce Ferrer y Padilla Alvelo y al senador Díaz Sánchez de impedirles participar en un proceso de primarias es inválida por contravenir las disposiciones de la Ley Electoral.[20]

Nos corresponde ahora determinar si el procedimiento seguido por el PNP para imponerle a los senadores-recurridos las otras sanciones antes mencionadas, fue válido a la luz de lo dispuesto en el propio Reglamento de la colectividad como en la Ley Electoral.

---

[19] Es preciso señalar que los partidos gozan de la facultad para establecer mediante reglamentación requisitos para calificar los candidatos idóneos que participen en sus primarias. Véase además, 16 L.P.R.A. sec. 3157.

[20] Ciertamente, cualquier disposición reglamentaria que contravenga lo aquí dispuesto es inválida.

**IV**

**A**

Los demandantes-recurridos reclamaron ante el Tribunal de Primera Instancia y ante este Tribunal que las acciones tomadas por el PNP en su contra eran contrarias a lo dispuesto en la Ley Electoral, específicamente, en la Declaración de Derechos y Prerrogativas de los Electores. Allí se dispone que, "[a] los fines de garantizar el libre ejercicio de la franquicia electoral, así como lograr la más clara expresión de la voluntad del pueblo", se reconoce "[e]l derecho de los electores afiliados al debido procedimiento de la ley en todo procedimiento disciplinario interno, al igual que en los proceso deliberativos y decisiones de sus partidos". 16 L.P.R.A. sec. 3051(7).

En defensa del procedimiento seguido al sancionar a los senadores recurridos, el PNP aduce que cumplió con las disposiciones de su reglamento, por lo que no se configura en este caso violación alguna a la Ley Electoral. Además, reclama que los partidos, como asociaciones voluntarias, tienen un derecho a asociarse libremente y que tal derecho les concede completa autonomía para atender y resolver sus asuntos internos, por lo que no se justifica la intromisión del Estado. Para sostener esta posición invocan la siguiente casuística: *Democratic Party of the United States v. Wisconsin ex rel. La Follette*, 450 U.S. 107 (1981); *Tashjian v. Republican Party of Connecticut*, 479

U.S. 208 (1986); y *Eu v. San Francisco County Democratic Central Committee*, 489 U.S. 214 (1989).[21]

Procedemos a examinar las alegaciones de las partes a la luz de las exigencias de la Ley Electoral.

**B**

En primer término, debemos puntualizar que la Ley Electoral en su artículo 2.001(7), 16 L.P.R.A. sec. 3051 (7), reconoce que un elector afiliado tiene derecho a "un debido proceso de ley" cuando va a ser sancionado por su partido. Esta exigencia de la Ley Electoral está cimentada en el interés legítimo del Estado de garantizar la expresión electoral de todo miembro afiliado a un partido. Además, adelanta el interés de proteger al elector individual de cualquier arbitrariedad de parte de los organismos del partido en el que milita.

Como se observa, la ley no dispone qué proceso debe seguir el partido al momento de disciplinar. Más bien, delegó en los partidos la encomienda de determinar mediante su reglamento cómo se conducirán los procesos disciplinarios internos de sus miembros afiliados. Claro

---

[21] Aun cuando el Partido Nuevo Progresista invoca dichos casos en su alegato para sostener su posición, se limita a citar aisladamente de los mismos sin prestar particular atención al contexto de estos casos y de la doctrina en éstos sentada, a la luz de los hechos que tenía el Tribunal Supremo de Estados Unidos ante sí. Por lo tanto, no nos indican por qué dichos casos deben ser dispositivos de la controversia ante nuestra atención, más allá de una aseveración de carácter conclusoria.

Por otro lado, los recurridos ignoran totalmente dichas referencias y, sorprendentemente, no discuten con rigor el argumento de los peticionarios respecto a su derecho de libre asociación invocado al amparo de los mismos.

está, el procedimiento que establezcan los partidos tiene que cumplir con unas garantías mínimas. *Véase discusión, infra*.

Con lo anterior de trasfondo, corresponde ahora evaluar si el PNP observó el procedimiento dispuesto en su Reglamento del año 2001[22] al sancionar a los senadores recurridos y si las salvaguardadas procesales que dicho Reglamento contempla, cumplen con el debido procedimiento de ley que la Ley Electoral le confiere a todo elector afiliado en un proceso disciplinario interno. *Id.*

V

A

La adecuada adjudicación del presente caso requiere que analicemos el procedimiento que culminó con la expulsión como sanción de los senadores McClintock

---

[22] Debemos puntualizar que en la Asamblea General del 14 de agosto de 2005, el PNP aprobó su Reglamento del 2005. Éste derogó el reglamento anterior del año 2001 y comenzó a regir inmediatamente después de su aprobación. *Véase* Artículo 102, Reglamento PNP del año 2005. No obstante, habiéndose comenzado el proceso disciplinario contra los senadores demandantes a tenor con las disposiciones del Reglamento de 2001, éste es el que habremos de aplicar. Cabe señalar, que el PNP no aduce que el Reglamento de 2005 es el que aplica en este caso. Por el contrario, su argumentación se centra en el Reglamento de 2001 y ese es el documento que se anejó al recurso se certificación.

En torno a los artículos que aquí discutimos, los cambios que este nuevo Reglamento introdujo fueron mínimos con excepción del artículo 98 del Reglamento del 2005 que le permite al Partido prohibirle a un miembro figurar como candidato bajo la insignia del PNP. Actualmente, el artículo 98 del Reglamento del 2005 (artículo 97 en el Reglamento del año 2001) dispone en su segundo párrafo que "[t]oda persona que desacate una decisión de la Asamblea General no podrá figurar como candidato bajo la insignia del Partido, ni ocupar posiciones de liderato." Art. 98, Reglamento PNP del año 2005.

Hernández y De Castro Font del PNP[23]; y el procedimiento seguido en contra de las senadoras Arce Ferrer, Padilla Alvelo y el senador Díaz Sánchez y las sanciones sumarias adicionales que le fueron impuestas, a saber: la censura, el retiro de la confianza y, la destitución de los puestos directivos dentro del organigrama interno del Partido.[24] En su alegato, los senadores recurridos aducen que el Partido incumplió con su Reglamento y con las exigencias de la Ley Electoral porque el Directorio del partido no les concedió una vista previa a la imposición de las sanciones disciplinarias en controversia. Rechazan que el Partido pudiera imponerles ningún tipo de sanción de forma sumaria. Arguyen además, que la Asamblea General carecía de jurisdicción para sancionarlos pues dicha facultad sólo le compete al Directorio; por lo que entienden que citarlos a una vista ante dicha Asamblea fue un acto "inoficioso".

Veamos entonces las disposiciones del Reglamento del PNP pertinentes a la jurisdicción disciplinaria de los diversos organismos internos del Partido.

---

[23] En esta tarea, no nos compete examinar la sabiduría de las motivaciones que llevaron al Partido Nuevo Progresista a iniciar los procedimientos disciplinarios en contra de los senadores demandantes, ni si procedía sancionar a los demandantes por las razones aducidas por el Partido. *Véase a modo ilustrativo, Democratic Party of United States v. Wisconsin ex rel. LaFollete,* 450 U.S. 107, 124 (1981). ("[A]s it is true of all expressions of First Amendment freedoms, the courts may not interfere on the ground that they view a particular expression as unwise or irrational.")

[24] Aquí debemos aclarar que ninguna de las partes en este caso nos ha expresado qué cargos desempeñaban los senadores sancionados en el Partido y de los cuales fueron separados. Tampoco surge de ninguno de los documentos que constan en autos.

**B**

Los artículos 8 y 97 del Reglamento del PNP del año 2001 rigen los procedimientos disciplinarios que los organismos internos del PNP pueden tramitar. En el presente caso, el Directorio y la Asamblea General instaron el procedimiento disciplinario en contra de los recurridos al amparo de dichos artículos.

El Directorio es el organismo supremo del Partido, cuando no estén reunidas la Junta Estatal o la Asamblea General. Artículo 29, Reglamento del PNP. Es el "principal custodio de la disciplina en el Partido", es el "último intérprete" del Reglamento y le compete resolver "finalmente cualquier controversia que surja sobre su interpretación o aplicación." *Id.*, Artículo 33. Por su parte, la Asamblea General es un organismo soberano que ejerce dicha soberanía mediante votación de la mayoría de los miembros presentes en sus reuniones. *Id.*, Artículo 12.

En materia de jurisdicción disciplinaria, el artículo 8 del Reglamento del PNP recoge en sus primeros párrafos los principios generales sobre disciplina de partido.[25]

---

[25] En particular, dicho artículo dispone:

> Todo miembro del Partido acatará y cumplirá los reglamentos, acuerdos y resoluciones aprobadas por los organismos rectores del Partido y servirá donde el Partido lo considere conveniente, conforme a su preparación, experiencia y capacidad, siempre en armonía con lo dispuesto en este Reglamento….
> Todo miembro del Directorio y de la Junta Estatal, incluyendo a los funcionarios que obtuvieron cargos electivos bajo el emblema del Partido, tienen pleno derecho a expresar con

*Id.,* Artículo 8. Este artículo, además, le concede jurisdicción al Directorio del Partido en casos de indisciplina para **censurar y suspender sumariamente** de sus cargos en el partido a un **oficial**[26] o **retirarle su confianza.** *Id.* Además, le concede al oficial sancionado el derecho de apelar la sanción impuesta ante el propio Directorio. *Id.* La determinación que tome el Directorio al atender la apelación será final y firme a todos los niveles del partido. *Id.*

**El artículo 97 del Reglamento establece el procedimiento disciplinario de carácter ordinario,** en contraposición con el procedimiento sumario contemplado en el artículo 8. Le confiere también a la Asamblea General y

_____

absoluta libertad sus opiniones o preferencias ante los organismos del Partido a los que pertenece. Pero una vez el asunto discutido es resuelto o adoptado democráticamente por votación mayoritaria del organismo concerniente, esa se convierte en la posición institucional del Partido. Ningún oficial del Partido podrá menoscabar públicamente o tratar de imponer su criterio personal por encima de la posición institucional que se haya adoptado por la colectividad. En casos de indisciplina evidente, temeraria o reiterada, el Directorio tendrá la obligación de **censurar o suspender sumariamente de su cargo al oficial** que así actúe, incluyendo el retiro de confianza. **La suspensión podrá ser temporera o permanente.** La decisión que así adopte el Directorio podrá ser apelada, a este organismo, por escrito presentado a la Secretaría dentro de los cinco (5) días a partir de la decisión del Directorio. La apelación resuelta por el Directorio será final y firme en todos los niveles del Partido. (Énfasis nuestro).

[26] Los artículos 61 al 70 del Reglamento incluyen como oficiales del partido al Presidente, Presidente Fundador y pasados Presidentes, Vicepresidentes estatales, Secretario, Subsecretario, Tesorero, Sub-Tesorero, Director de Fianzas, Comisionado Electoral y Comisionado Electoral Alterno.

al Directorio la facultad de imponer sanciones disciplinarias. En primer término, dicho artículo dispone que la Asamblea General podrá "tomar cualquier medida o sanción disciplinaria contra cualquier miembro del Partido, incluyendo su expulsión", esto, "tomando excepción de las determinaciones que haga el Directorio como parte del procedimiento disciplinario dispuesto en el segundo párrafo del Artículo 8." *Id.,* Artículo 97. Por tanto, con excepción de los casos en los que el Directorio tiene jurisdicción bajo el artículo 8 del Reglamento, la Asamblea tiene jurisdicción disciplinaria, la cual incluye expulsar del partido a un miembro afiliado.

Por otro lado, al detallar las medidas disciplinarias que el Directorio podrá imponer, el artículo 97 dispone en su segundo párrafo que "en casos como los descritos en el segundo párrafo del Artículo 8[,] [el Directorio] podrá tomar cualquier medida o sanción disciplinaria como la suspensión temporera o permanente del cargo y el retiro de confianza contra cualquier miembro, oficial, o funcionario del Partido. No obstante, **podrá recomendar a la Asamblea General o a la Junta Estatal la expulsión de sus miembros.**" *Id.* (énfasis nuestro). De esta forma, el artículo 97 reitera lo dispuesto en el artículo 8, pero aclara que **el Directorio está impedido de imponer la sanción de expulsión, facultad que se le reserva a la Asamblea General como organismo soberano o a la Junta Estatal.**

Finalmente, luego de detallar la jurisdicción general que tanto la Asamblea General como el Directorio poseen en materia disciplinaria, a modo de excepción, el artículo 97 señala que "en caso de tratarse de **oficiales electos o candidatos** a puestos públicos como Gobernador(a), Comisionado(a) Residente, **Legislador(a)** o Alcalde(sa), o miembros del Directorio o la Junta Estatal[,] **la medida disciplinaria será jurisdicción exclusiva del Directorio, conforme al segundo párrafo del Artículo 8."** *Id.* (énfasis nuestro).

Un análisis minucioso, integrado y razonable de lo dispuesto en los artículos 8 y 97 del Reglamento del PNP refleja que el Directorio posee jurisdicción exclusiva para sancionar a los senadores recurridos en virtud de su condición de legisladores. Esta jurisdicción, sin embargo, no le confiere potestad al Directorio para sancionarlos sumariamente. Ello así, debido a que el artículo 8 sólo le confiere jurisdicción al Directorio para sancionar sumariamente a **los oficiales** del Partido.[27] Los senadores sancionados no son oficiales del Partido conforme se dispone en el propio Reglamento del Partido. Allí se indica que son oficiales del Partido los siguientes funcionarios: el Presidente, Presidente Fundador y pasados Presidentes, Vicepresidentes estatales, Secretario,

---

[27] Además, este artículo sólo le permite al Directorio suspender, censurar o retirar la confianza que el Partido ha depositado en sus oficiales.

Comisionado Electoral y Comisionado Electoral Alterno. Véase artículos 61 al 70 del Reglamento.

En virtud de lo anterior, el procedimiento disciplinario que se puede instar en contra de un legislador es el proceso ordinario que se recoge en el artículo 97(b). En atención a lo cual, tenemos que concluir que el proceso disciplinario que se podía tramitar en contra de los demandantes recurridos era precisamente el de naturaleza ordinaria. En cuyo caso, había que salvaguardar las garantías procesales mínimas para tales casos que se establecen en el inciso b del artículo 97 del Reglamento.[28] En específico, allí se dispone que el Partido

---

[28] Específicamente, el inciso b del artículo 97 dispone:

> b. Procedimiento en casos ordinarios, no aplicables al Artículo 8: Con anterioridad a la aplicación de cualquier medida disciplinaria, se seguirá el procedimiento uniforme que, a tal efecto, establezca el Comité de Conciliación y apruebe el Directorio, el cual deberá contener las etapas o guías mínimas siguientes:
>
> 1. Formulación de cargos por escrito.
> 2. Debida notificación a la parte afectada.
> 3. Establecimiento de término para contestar.
> 4. Celebración de vista en privado:
>     a. Para la presentación de prueba.
>     b. Para la defensa del afectado.
> 5. Decisión mediante voto secreto por mayoría de los presentes en reunión debidamente constituida.
> 6. Notificación de la resolución a las partes afectadas, a la Secretaría del Partido y a los organismos rectores correspondientes.
>
> . . . .
> Toda resolución de censura o medida disciplinaria será notificada al(a la) Secretario(a) del Partido dentro de los diez (10) días siguientes

le debe garantizar al miembro afiliado afectado las siguientes garantías procesales mínimas: la formulación de cargos por escrito, la notificación de éstos, la celebración de una vista para presentar y rebatir prueba, una decisión mediante voto mayoritario, la notificación de la resolución y el derecho de apelar la imposición de la medida disciplinaria ante el Comité de Conciliación.[29]

El establecimiento de estas garantías procesales mínimas, obedece al mandato legislativo contenido en la Ley Electoral. El Partido, una vez insta un procedimiento disciplinario de carácter ordinario, viene obligado a ceñirse estrictamente al procedimiento establecido, garantizándole así a la parte afectada todas y cada una de las garantías procesales mínimas que se detallan en el Reglamento. Repetimos, una vez se establecen reglamentariamente las garantías mínimas que la ley exige, el Partido no puede apartarse de las mismas. Sólo de esta forma se cumple con el mandato de la ley que garantiza un debido proceso.

---

de haberla recibido. Esta notificación vendrá acompañada de un acta que recoja en detalle todos los procedimientos que se realizaron en la reunión donde se tomó tal acción. El afectado podrá apelar al Comité de Conciliación dentro de los diez (10) días siguientes de haber sido notificado con copia de la resolución de censura. Este artículo será de estricto cumplimiento.

[29] El Comité de Conciliación tiene jurisdicción para atender "los asuntos de conflictos interpersonales que le encomiende el(la) Presidente o el Directorio. También entenderá en los casos de querellas, impugnaciones, acciones disciplinarias y la formulación de cargos". Art. 54, Reglamento PNP.

Pasemos a evaluar los casos particulares de los senadores recurridos, para determinar si el proceso seguido en contra de estos se ajustó a lo que hemos dispuesto.

**C**

El 8 de junio de 2005, el Directorio del PNP destituyó al senador De Castro Font de toda posición de liderato en el Partido, lo suspendió **sumariamente** como miembro del Partido y le indicó que había recomendado su expulsión a la Junta Estatal o a la Asamblea General del Partido. En ese momento, el Directorio le informó que podría apelar dicha determinación **al Directorio**. Un mes más tarde, el Directorio declaró no ha lugar su apelación y le indicó que la Asamblea General le concedería una vista para argumentar y presentar prueba a su favor.

En el caso de los senadores McClintock Hernández y Díaz Sánchez y de las senadoras Padilla Alvelo y Arce Ferrer, el Directorio determinó relevarlos **sumariamente** de sus posiciones de liderato en el Partido, les prohibió participar en sus organismos rectores y los suspendió sumaria y permanentemente como miembros del partido. Al imponerles sumariamente las antes detalladas sanciones, el Directorio del PNP sólo les notificó **que tenían derecho de apelar ante el propio Directorio** y un mes más tarde les notificó que podrían acudir a una vista ante la Asamblea General del Partido.

Finalmente, el Directorio también **expulsó sumariamente** al senador McClintock del Partido. Mediante misiva con

fecha del 8 de marzo de 2006, el Directorio le notificó que, a petición de la Asamblea General, se había determinado su expulsión del partido, le informó de su derecho de apelar dicha determinación ante la Asamblea General del Partido y que podría solicitar audiencia ante dicho cuerpo. Luego, le notificó que tendría derecho de acudir a una vista ante la Asamblea General.

**Un examen de los procedimientos disciplinarios que el PNP siguió en contra de los senadores recurridos refleja que esta organización se desvió del procedimiento que ella misma había establecido para imponer sanciones a sus miembros. Al así hacerlo incumplió no tan solo con su Reglamento sino también, con el claro mandato de la Ley Electoral que obliga a los partidos a reconocer el debido proceso de ley en los procedimientos disciplinarios de sus miembros.**

El Directorio aprobó de forma sumaria las diversas sanciones disciplinarias impuestas a los legisladores y luego les informó sobre la imposición de las mismas. En ningún momento, previo a la imposición o recomendación de las mismas, los demandantes recurridos recibieron una notificación adecuada de los cargos presentados en su contra, ni tuvieron oportunidad de presentar prueba y argumentar a su favor ante el Directorio del Partido. Recuérdese, como ya concluimos, que el proceso disciplinario que se podía instar en contra de éstos era el proceso ordinario contemplado en el artículo 97(b), lo que

exigía que se le garantizaran, como mínimo, las garantías allí contempladas. Más grave aún, a pesar de que en sus respectivos escritos de apelación los senadores reclamaron su derecho al procedimiento disciplinario dispuesto en el artículo 97(b) del Reglamento, el Directorio hizo caso omiso de tal reclamo.

De forma sumaria además, el Directorio declaró no ha lugar cada una de las apelaciones presentadas por los senadores recurridos. Esto, a pesar de que el Directorio carecía de jurisdicción para atender las apelaciones de los senadores recurridos pues el artículo 97(b) del Reglamento le confiere dicha facultad al Comité de Conciliación.

Este catálogo de incumplimientos con lo dispuesto en el Reglamento del PNP, necesariamente, vicia de nulidad todo el proceso disciplinario seguido por el Partido en contra los senadores demandantes. En vista de lo anterior, resolvemos que al suspender como miembros del Partido, relevarlos de las posiciones de liderato, y luego expulsar del mismo a los senadores McClintock y De Castro Font, y al suspender sumaria y permanentemente a las senadoras Padilla Alvelo y Arce Ferrer y al senador Díaz Sánchez como miembros del Partido, separarlos de sus cargos en el Partido y censurarles sumariamente, el Directorio del PNP incumplió con los requisitos dispuestos en el artículo 97(b) del Reglamento del Partido, en cuyo caso **todas las sanciones disciplinarias impuestas son nulas.**

Recapitulando, al imponer cualquier sanción a un miembro del Partido que no sea **un oficial**, el artículo 97(b) del Reglamento del PNP requiere que el Partido inicie un procedimiento disciplinario ordinario. De esta forma, previo a la imposición o recomendación de las antes detalladas sanciones, los senadores tenían un derecho tutelado por el Reglamento del Partido a que el Directorio: les informara y notificara por escrito de los cargos, les concediera un término para contestar, se celebrara una vista ante el propio Directorio en la cual se presentaría prueba de los cargos como prueba para refutarlos, que la decisión que se tomara fuera mediante el voto secreto, que se notificara la decisión final a todas las partes concernidas y que se les concediera la oportunidad de apelar la sanción ante el Comité de Conciliación.[30] Éste no fue el procedimiento que se siguió en contra de los senadores recurridos, por el contrario, todas las sanciones impuestas se impusieron de forma sumaria. El desvío del proceso establecido en el artículo 97(b) de parte del Partido, vicia de nulidad todo el proceso seguido en contra de los senadores por lo que las sanciones impuestas son nulas. Señalamos previamente que una vez el Partido

---

[30] Debido a que el Directorio posee jurisdicción exclusiva para sancionar a los senadores recurridos, entendemos que éste era el organismo llamado a celebrar la vista a la cual los senadores tenían derecho. Empero, debemos recalcar que la Asamblea General es el único organismo que posee jurisdicción para expulsar a un miembro del partido. Por tanto, la Asamblea era el organismo llamado a decretar finalmente la expulsión de los senadores De Castro Font y McClintock del Partido.

establece los requisitos del procedimiento disciplinario en su Reglamento, tal y como ordena la Ley Electoral, se tiene que atener a los mismos, de lo contrario el proceso que se inste será nulo.

Finalmente, el procedimiento dispuesto en el artículo 97(b) del Reglamento del PNP satisface las exigencias del artículo 2.001(7) de la Ley Electoral, 16 L.P.R.A. sec. 3051(7), porque reduce la posibilidad de arbitrariedad de parte del Partido al proveer la oportunidad de una vista previa antes de imponer o recomendar una sanción disciplinaria. Y en dicha vista, se tiene la oportunidad de argumentar y presentar prueba, la decisión se toma mediante el voto secreto y se puede apelar la determinación disciplinaria final al Comité de Conciliación. Estas salvaguardas son justas y razonables.

**VI**

En conclusión, resolvemos que el procedimiento seguido por el PNP en contra de las senadoras y los senadores recurridos no se ajustó a lo dispuesto en el Reglamento del PNP. En vista de lo anterior, hay que concluir que tienen razón los demandantes-recurridos al argüir que el Partido Nuevo Progresista erró al no proveerles las garantías procesales del artículo 97(b) de su Reglamento.

En virtud de lo anterior, procede modificar la sentencia *nunc pro tunc* dictada por el Tribunal de Primera Instancia. A esos efectos se dictará sentencia declarando nulas las sanciones impuestas por el Partido Nuevo

Progresista contra los senadores McClintock, De Castro Font y Díaz Sánchez, así como a las senadoras Arce Ferrer, Padilla Alvelo, por cuanto el procedimiento seguido para la imposición de las mismas no se ajustó a lo establecido en el Reglamento del PNP. Se dispone además, que la sanción impuesta de impedir que se participe en un proceso de primarias, como ocurrió en el caso de las senadoras Arce Ferrer y Padilla Alvelo y el senador Díaz Sánchez, es nula por contravenir el mandato expreso de la Ley Electoral que garantiza que todo elector afiliado de un partido tiene derecho a que se le considere para ser nominado por su partido para cualquier cargo electivo. 16 L.P.R.A. sec. 3156.[31] Finalmente, los demandados peticionarios están impedidos de negarle a los senadores recurridos, como miembros y electores afiliados del PNP, los derechos y prorrogativas que la Ley Electoral les reconoce. De así actuar, se colocarían al margen de la ley.

Se dictará sentencia de conformidad.

Anabelle Rodríguez Rodríguez
Juez Asociada

---

[31] En relación al planteamiento de incuria levantado por los demandados debemos rechazar el mismo. Ante la importancia de los derechos reclamados por los senadores sancionados y toda vez que los demandados no demostraron que la dilación en instar la demanda les causara grave daño que supere el interés público involucrado en esta controversia, no le damos curso al planteamiento. Véase, *Pueblo v. Tribunal*, 81 D.P.R. 904, 912 (1960).

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Kenneth McClintock Hernández, Luz Z. Arce Ferrer, Jorge De Castro Font, Carlos Díaz Sánchez y Migdalia Padilla Alvelo<br><br>Demandantes-Apelados<br>v.<br><br>Thomas Rivera Schatz, en su capacidad de Secretario General, Comisionado Electoral y Oficial del Partido Nuevo Progresista y El Partido Nuevo Progresista<br><br>Demandados-Apelantes | CT-2007-4 |

SENTENCIA

San Juan, Puerto Rico, a 12 de junio 2007

Por los fundamentos expuestos en la Opinión que antecede, los cuales se incorporan íntegramente a la presente, se dicta sentencia y se declaran nulas las sanciones impuestas por el Partido Nuevo Progresista contra los senadores Kenneth McClintock Hernández, Jorge De Castro Font y Carlos Díaz Sánchez, así como a las senadoras Luz Z. Arce Ferrer y Migdalia Padilla Alvelo. Se dispone además, que la sanción impuesta de impedir que se participe en un proceso de primarias, como ocurrió en el caso de las senadoras Arce Ferrer y Padilla Alvelo y el senador Díaz Sánchez, es nula por contravenir el mandato expreso de la Ley Electoral que garantiza que todo elector afiliado de un partido tiene derecho a que se le considere para ser nominado por su partido para cualquier cargo electivo. 16 L.P.R.A. sec. 3156. Finalmente, los demandados peticionarios están impedidos de negarle a los senadores recurridos, como miembros afiliados del PNP, los derechos y prerrogativas que la Ley Electoral les reconoce. De así actuar, se colocarían al margen de la ley.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Presidente señor

Hernández Denton emite Opinión de conformidad.  La Jueza Asociada señora Fiol Matta hace constar lo siguiente:

La Jueza Asociada señora Fiol Matta está conforme con la Opinión del Tribunal, pero concurre con la parte II por entender que los partidos políticos en Puerto Rico no son propiamente *entes* cuasi-gubernamentales, sino que están *investidos* de poderes cuasi-gubernamentales, y *desempeñan* funciones de esa naturaleza, tal y como lo ha reconocido nuestra jurisprudencia.

El Juez Asociado señor Rivera Pérez disiente con opinión escrita.


                        Aida Ileana Oquendo Graulau
                        Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Kenneth McClintock Hernández,
Luz Z. Arce Ferrer, Jorge de
Castro Font, Carlos Díaz
Sánchez y Migdalia Padilla Alvelo

     Demandantes-Apelados

         v.                      CT-2007-4

Thomas Rivera Schatz, en su
capacidad de Secretario General,
Comisionado Electoral y Oficial
del Partido Nuevo Progresista
y el Partido Nuevo Progresista

     Demandados-Apelantes


Opinión de Conformidad emitida por el Juez Presidente señor Hernández Denton

San Juan, Puerto Rico a 12 de junio de 2007.

Suscribimos la Opinión de este Tribunal que determina que el Partido Nuevo Progresista no cumplió con su reglamento en el proceso disciplinario seguido en contra de los Senadores Kenneth McClintock, Luz Z. Arce Ferrer, Jorge de Castro Font, Carlos Díaz Sánchez y Migdalia Padilla Alvelo. No obstante, consideramos preciso expresarnos de forma particular con el fin de puntualizar ciertos rasgos de los partidos políticos en Puerto Rico que inciden directamente en nuestro andamiaje electoral, razón por la que se espera de ellos un estricto cumplimiento con dicho ordenamiento, particularmente en lo relativo al

proceso disciplinario aplicable a funcionarios

elegidos por electores afiliados.

I

Al evaluar el recurso de autos, partimos de la premisa de que los partidos políticos, al igual que sus miembros, están cobijados por el derecho de asociación para adelantar sus respectivas ideologías y obtener suficientes votos para dirigir el destino de un país[32]. En vista de que son organizados por un grupo de personas con unos objetivos específicos, no ponemos en tela de juicio la facultad que tienen para regular sus procesos internos y su estructura organizacional[33]. Además, reconocemos las prerrogativas de los partidos políticos a la hora de elegir a sus miembros, toda vez que ello es corolario del derecho a la libre asociación[34].

Ahora bien, también resulta innegable que los partidos políticos ejercen un rol primordial en nuestro sistema electoral lo que, sin duda, incide sobre el ordenamiento democrático. Ello en vista de que son las vías mediante las cuales se canalizan las distintas tendencias políticas, ideológicas y económicas de la sociedad y a través de las cuales se facilita la organización y efectividad de la

---

[32] Esa garantía surge del Art. II, Sec. 6 de la Constitución del E.L.A. y del derecho de asociación de la Primera Enmienda de la Constitución federal, el cual se hizo extensivo a los Estados a través de la Decimocuarta Enmienda. Véase, además, Federal Election Com'n v. Colorado Republican Fed. Campaign Committee, 533 U.S. 431 (2001).

[33] Véase Secretary of State v. San Francisco County Democratic Central Committee, 489 U.S. 214 (1989); Democratic Party of the United Status v. Wisconsin ex rel. La Follette, 450 U.S. 107 (1981).

[34] California Democratic Party v. Jones, 530 U.S. 567 (2000).

participación colectiva. P.S.P. v. E.L.A., 107 D.P.R. 590, 610 (1978).

El rol protagónico de los partidos políticos en Puerto Rico se debe, en gran medida, a que el Estado ha delegado en ellos funciones inherentemente gubernamentales relacionadas a la estructuración del proceso electoral. Así, por ejemplo, el Estado delegó en los partidos políticos la función de nominar candidatos para cargos electivos, Art. 4.004 de la Ley Electoral, Ley Núm. 4 de 20 de diciembre de 1977, 16 L.P.R.A. sec. 3154, y les confirió la facultad de asignar las prioridades de los candidatos a senadores y representantes por acumulación, por precintos electorales. Precisamente por esas facultades delegadas, los partidos políticos deben cumplir con rigurosas normas electorales y operan bajo un esquema diseñado para que el Estado pueda fiscalizar varias de sus actividades. Véase P.S.P. v. E.L.A., supra, pág. 610-611.

Más aún, dado que algunas de las funciones de los partidos políticos en nuestro país son eminentemente de carácter público, el Estado subsidia algunas de sus actividades mediante la asignación de fondos a través del Fondo Electoral, según dispuesto en la Ley Electoral, supra. En particular, dicho estatuto dispone que en los años que no son de elecciones generales, cada partido principal o partido por petición puede girar contra el Fondo Electoral hasta un máximo de $300,000 y en años de elecciones generales hasta un máximo de $600,000. 16 L.P.R.A. sec.

3116. Asimismo, para sufragar los gastos de campaña de los partidos políticos el Secretario de Hacienda ingresa en un Fondo Voluntario una asignación base de $3,000,000 para cada partido; un máximo de $4,000,000 de contribuciones recaudadas, y una asignación progresiva de hasta $4,000,000. 16 L.P.R.A. sec. 3117(c). Además, la ley dispone que los partidos políticos que en el año de elecciones se acogen a los beneficios del Fondo Electoral pueden incurrir en gastos de campaña adicionales que no excedan de $5,000,000. 16 L.P.R.A. sec. 3117a. Las sumas asignadas a través del Fondo Electoral pueden utilizarse para primarias, convenciones, asambleas y hasta para gastos generales de oficina. 16 L.P.R.A. sec. 3118.

De hecho, entre los años 1997 y 2002 los partidos políticos recibieron alrededor de $15.7 millones como subsidio electoral[35]. Debido a dicho subsidio la Oficina del Contralor de Puerto Rico fiscaliza cuidadosamente el uso del dinero recibido del Fondo Electoral por cada partido y somete regularmente informes. Igualmente la Comisión Estatal de Elecciones audita regularmente el uso de los fondos recibidos por los partidos políticos.

Todo lo anterior pone de manifiesto la importancia de los partidos en el proceso electoral, hasta el punto que el

---

[35] Por otro lado, según surge del "Informe de Gastos Presupuestarios de la Comisión Estatal de Elecciones y los Partidos Políticos", para los años 2002-2004 los partidos en conjunto requirieron una aportación de $900,000 mientras que en los años 2006-2007 requirieron una aportación de $603,000. Por su parte, para el próximo año se recomendó una asignación de $900,000 para los partidos políticos.

Estado ha dejado en sus manos elementos importantes de dicho proceso y por eso se les proveen fondos del erario público para su sostenimiento y gastos de operación. Véase P.S.P. v. E.L.A., *supra*, pág. 610. Además, refleja que los partidos políticos están íntimamente ligados al derecho de los ciudadanos de participar en el proceso electoral, elemento base del sistema democrático. Véase P.A.C. v. E.L.A., 150 D.P.R. 359, 372 (2000). Su rol es de tal importancia que se entiende que "existe una correlación entre el sistema de partidos y el ordenamiento constitucional". *Id*.

De hecho, los partidos políticos a través de sus comisionados electorales forman parte de la Comisión Estatal de Elecciones, organismo responsable de dirigir todos los procedimientos de naturaleza electoral. Los comisionados devengan una remuneración anual equivalente a la que reciben los secretarios de uno de los departamentos ejecutivos del Gobierno. 16 L.P.R.A. sec. 3004. Precisamente, de esa interrelación tan singular entre los partidos políticos y el sistema electoral en Puerto Rico resulta evidente que, en los extremos antes descritos, dichas agrupaciones tienen funciones públicas de naturaleza cuasi-gubernamental. Por estas razones es que estudiosos del calibre del Profesor Robert W. Anderson han afirmado que:

> "[…] La Ley Electoral subvenciona a los partidos políticos, reconociendo así el papel central que éstos desempeñan en todo el proceso electoral. Al hacerlo, se otorgan ciertas ventajas y privilegios a los partidos principales, convirtiéndolos en organismos semioficiales del Estado. A la misma vez, […] se trata de controlar o limitar las

> contribuciones privadas a los partidos para que éstos no se vean como excesivamente dependientes de intereses particulares. En efecto, los partidos son a la vez instituciones públicas y privadas. Es la interacción de estos dos aspectos –igualmente importantes– lo que le presta dinamismo e interés a la política partidista electoral dentro de un clima contencioso y controvertible"[36] .

Así, pues, aunque los partidos políticos nacen como asociaciones voluntarias de índole privada, lo cierto es que en Puerto Rico –por delegación legislativa expresa– éstos ejercen varias funciones de carácter gubernamental de gran trascendencia para el sistema democrático, lo cual los convierte –para esos fines– en entidades cuasi-gubernamentales. Ahora bien, eso no significa que podemos emplear el calificativo "gubernamental" livianamente, ya que eso implica privar a los partidos políticos de su carácter de entidad privada y, por ende, limitar sus facultades y prerrogativas. Por lo tanto, con el fin de evitar la restricción injustificada de los derechos y libertades que cobijan a los partidos políticos, lo que corresponde es analizar caso a caso la actuación en controversia para determinar si, en realidad, puede ser considerada una de carácter público o gubernamental.

Conforme sostienen Hays Lowenstein y Hasen en su tratado Election Law, la respuesta más común es que **"cuando los partidos nominan candidatos o realizan otras actividades directamente conectadas con la celebración de las**

---

[36] R. Anderson, J. Jiménez Polanco y E. Meléndez, Política Electoral en Puerto Rico, 2da. ed., Ed. Plaza Mayor, Puerto Rico, 2004, pág. 81.

**elecciones, sus actividades son públicas. Otras actividades, tales como el gobierno interno y la adopción de plataformas, son privadas**"[37]. De lo anterior podemos entender que si se trata de una actuación que incide en el funcionamiento mismo del proceso electoral y los derechos de los electores, la acción es de carácter gubernamental. En sentido contrario, si se trata de un acto que no afecta el proceso electoral ni los derechos de los electores, no se puede hablar de acción pública o gubernamental[38].

Resulta evidente, pues, que definir cuáles actos de los partidos políticos son de carácter gubernamental y cuáles son de naturaleza privada encierra una gran dificultad[39]. A pesar de ello, y conforme al análisis antes esbozado, también nos parece evidente que cuando los partidos políticos realizan actos mediante los cuales ejercen una función pública, tienen que cumplir con el ordenamiento

---

[37] D. Hays Lowenstein y R. Hasen, Election Law, Cases and Materials, 2da. Ed., Carolina Academic Press, North Carolina, 2001, pág. 456 (traducción y énfasis nuestro).

[38] Así lo han entendido también los tribunales. Véase Smith v. Allwright, 321 U. S. 649 (1944); State of Georgia v. National Democratic Party, 447 F. 2d 1271 (1971); Bentman v. Seventh Ward Democratic Executive Committee, 218 A. 2d 261 (1966); The Ripon Society v. National Republican Party, 525 F. 2d 548 (1975).

[39] De hecho, Hays Lowenstein y Hasen sostienen que el análisis mencionado (mejor llamado "middle-ground approach) "puede mitigar pero no resolver el dilema público/privado que existe para aquellos que creen que hay al menos algunas situaciones en las cuales a los partidos se les debe requerir honrar los derechos constitucionales y otras situaciones en las cuales los partidos deben poseer derechos constitucionales". Hays Lowenstein, *supra*, pág. 456 (traducción nuestra).

electoral y con las normas constitucionales que les sean oponibles[40].

En vista de lo anterior, el Partido Nuevo Progresista está obligado a cumplir con la Ley Electoral, *supra*, la cual dispone que se declaran como válidos y esenciales los siguientes derechos:[…] "(7) El derecho de los electores afiliados al debido procedimiento de la ley en todo procedimiento disciplinario interno, al igual que en los procesos deliberativos y decisiones de sus partidos". 16 L.P.R.A. sec. 3051(7). Dicha garantía es cónsona con la naturaleza pública de varias funciones de los partidos políticos y con la importancia del rol que se les ha delegado en nuestro ordenamiento.

_____

[40] A base de un análisis similar, hace décadas el Tribunal Supremo de los Estados Unidos evaluó la constitucionalidad de una actuación del Partido Demócrata de Texas mediante la cual se le negó a los miembros de la raza negra la posibilidad de participar en las primarias. Smith v. Allwright, *supra*. Dicho Foro expresó que "[las] primarias son conducidas por el partido bajo autoridad legislativa estatal" y que, en esa medida, el partido constituye una agencia del Estado en cuanto determina quiénes serán los participantes en las primarias. (traducción nuestra) *Id*. a la pág. 764-765. Sostuvo que los partidos advienen agentes del Estado por medio de las responsabilidades que se les imponen por vía legislativa, las cuales no son asuntos de interés privado meramente porque las realice un partido político. *Id*. a la pág. 765. Otros tribunales también le han aplicado a los partidos políticos ciertas restricciones constitucionales al amparo de la doctrina de acción estatal. Bentman v. Seventh Ward Democratic Executive Committee, *supra*; The Ripon Society v. National Republican Party, *supra*; Bode v. National Democratic Party, 452 F. 2d 1302 (1971). En virtud de dicha doctrina se evalúa si la entidad privada ejerce una función impregnada de carácter gubernamental, en cuyo caso su conducta puede ser atribuida al Estado y, por ende, podría estar sujeta a las correspondientes restricciones constitucionales. Véase Lebrón v. National Railroad Passenger Corp., 115 S. Ct. 961 (1995); Pueblo v. Rosario Igartúa, 129 D.P.R. 1055 (1992).

En aparente reconocimiento de ello, el Partido Nuevo Progresista incorporó a su propio Reglamento ciertas salvaguardas procesales para los electores afiliados que, además, han sido electos a algún cargo público como Gobernador, Comisionado Residente, Legislador o Alcalde. En particular, el Art. 97 del Reglamento dispone que el procedimiento disciplinario aplicable en casos ordinarios es el siguiente: "Con anterioridad a la aplicación de cualquier medida disciplinaria, se seguirá el procedimiento uniforme […], el cual debe contener las etapas o guías mínimas siguientes:

1. Formulación de cargos por escrito
2. Debida notificación a la parte afectada
3. Establecimiento del término para contestar
4. Celebración de vista en privado
    i. para la presentación de prueba
    ii. para la defensa del afectado
5. Decisión mediante voto secreto por mayoría de los presentes en reunión debidamente constituida.
6. Notificación de la resolución a las partes afectadas, a la Secretaría del Partido y a los organismos rectores correspondientes".

No obstante, como medida adicional para atender los casos de los electores afiliados que ocupan cargos públicos electivos, se dispone en dicho artículo que –siguiendo el proceso mencionado– el organismo llamado a imponer la sanción disciplinaria es el Directorio. Reglamento del Partido Nuevo Progresista, *supra*, Art. 97(b).

De todo ello se desprende que el Partido Nuevo Progresista consideró que los electores afiliados que

ocupan cargos públicos electivos ameritan unas garantías procesales mínimas. Y es que no podía ser de otra forma, toda vez que un proceso disciplinario que pudiera conllevar la expulsión de un funcionario electo como representante de cierto partido, sería contrario a las expectativas de los electores que votaron por dicho funcionario. Si bien eso no conlleva la destitución del cargo público en cuestión, sin duda, podría atentar contra la confianza de aquellos electores que lo escogieron como representante de determinada colectividad. Ello, a su vez, causaría que el acto alegadamente interno adquiera trascendencia pública y afecte la base misma del sistema representativo que caracteriza nuestra democracia. Es por eso que se justifica que este tipo de funcionario esté cobijado por ciertas garantías procesales.

**Si bien conforme a su propia reglamentación el Partido Nuevo Progresista estaba obligado a seguir el proceso ordinario en contra de los Senadores recurridos, lo cierto es que no cumplió ni siquiera con dicha normativa.** Contra todos los Senadores recurridos se presentó una querella donde se recomendaron diversas sanciones. Dicha querella se les notificó después que el Directorio había tomado una determinación en su contra. A todas luces, ese proceso adolece de serios defectos. Los cargos imputados no se les notificaron con suficiente tiempo de antelación como para que éstos pudieran defenderse. De hecho, la determinación se tomó sin habérseles notificado del proceso y, por tanto,

sin que estuvieran presentes para defenderse y presentar prueba a su favor. Todo ello, evidentemente, contraviene las pautas mínimas establecidas en el Reglamento del Partido Nuevo Progresista y, en última instancia, la propia Ley Electoral, *supra*. Por tanto, el dictamen emitido, así como cualquier determinación ulterior basada en el mismo, carece de validez.

Por los fundamentos expuestos, estamos conformes con la Opinión emitida y sostenemos que los partidos políticos en nuestro país, por la importancia de su rol en el sistema electoral y por el carácter gubernamental de muchas de sus acciones, están particularmente obligados al cumplimiento de las normas que rigen nuestro ordenamiento electoral.

II

A modo de epílogo, al resolver de esta manera, tenemos presente que este Tribunal constituye el máximo guardián de los principios constitucionales que caracterizan la vida democrática. Ese rol nos exige examinar con entereza cualquier situación traída ante nuestra atención que ponga en riesgo los valores garantizados por tales principios.

Al ejercer nuestra función constitucional lo hacemos con la prudencia que el pueblo exige de aquellos a quienes se les ha delegado la responsabilidad de ejercer una función pública, particularmente desde este estrado apelativo. Somos conscientes de que los tribunales son, en última instancia, los garantes del Estado de Derecho, por lo que tenemos la ineludible obligación constitucional de

evitar que los conflictos económicos, sociales y políticos socaven y pongan en peligro la paz, el bienestar y la seguridad que los puertorriqueños aspiramos. Invitamos a todos los buenos puertorriqueños a contribuir al clima de paz y sosiego que Puerto Rico necesita en estos momentos tan importantes en nuestra vida democrática y a rechazar a todo aquel que nos quiera conducir por otros senderos.

Federico Hernández Denton
Juez Presidente

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Kenneth McClintock Hernández, Luz Z. Arce Ferrer, Jorge de Castro Font, Carlos Díaz Sánchez y Migdalia Padilla Alvelo
    Demandantes Apelados

v.                    CT-2007-4

Thomas Rivera Schatz, en su capacidad de Secretario General, Comisionado Electoral y Oficial del Partido Nuevo Progresista y el Partido Nuevo Progresista
    Demandados Apelantes

Opinión Disidente emitida por el Juez Asociado señor Rivera Pérez.

San Juan, Puerto Rico, a 12 de junio de 2007.

El Juez Asociado señor Rivera Pérez disiente del curso de acción tomado por la Mayoría. Los apelados violaron el juramento que prestaron al momento de presentar sus candidaturas como senadores por acumulación y por distrito bajo la insignia del Partido Nuevo Progresista, en adelante P.N.P., en los comicios electorales del año 2004. Por virtud de ese juramento, se comprometieron y se obligaron a acatar y cumplir los reglamentos, acuerdos y resoluciones de los organismos rectores de ese partido. No obstante, los apelados no cumplieron con la Resolución

de la Asamblea General del P.N.P., aprobada el 15 de mayo de 2005, en la cual se instruyó a todos los senadores electos por ese partido político a elegir al Honorable Pedro Rosselló González, Presidente de la colectividad y Senador por el distrito de Arecibo, como Presidente de ese cuerpo legislativo. Los apelados no acataron la decisión mayoritaria del Caucus de la mayoría parlamentaria del P.N.P. en el Senado, tomada el 26 de mayo de 2005, de cumplir con el mandato de la Asamblea General de ese partido político sobre esos extremos.

Los apelados violaron el primer párrafo del Artículo 8 y el Artículo 45 del Reglamento del P.N.P. Violaron, además, la declaración de propósitos de esa colectividad política infringiendo de esa forma el Artículo 5 de ese reglamento.

Concluimos que el P.N.P. no violó la garantía a un debido procedimiento de ley de los apelados, al imponerle las medidas disciplinarias en cuestión. <u>El debido proceso de ley no tiene un contenido fijo independiente de la situación particular presente</u>. **<u>Su contenido es siempre circunstancial</u>**. <u>Gilbert v. Homar</u>, 520 U.S. 92 (1997); <u>Morrissey v. Brewer</u>, 408 U.S. 471 (1972); <u>Cafeteria Workers v. McElroy</u>, 367 U.S. 886 (1961).

Las circunstancias particulares y procesales del caso de marras claramente demuestran que no es procedente el curso de acción de la Mayoría. No está presente ante nos, exigencia válida de debido proceso de ley que justifique tal proceder. A los apelados no le asiste derecho propietario alguno que

reclamar frente al P.N.P.  La condición de **"miembro afiliado"** de un partido político no es un derecho protegido; queda sujeto al cumplimiento del reglamento y de las resoluciones y acuerdos de los organismos rectores de la colectividad política. Los derechos y privilegios de los apelados como legisladores electos al Senado de Puerto Rico no fueron afectados en forma alguna.

El derecho de asociarse libremente con el fin de adelantar principios e ideas políticas comunes, bajo la Primera Enmienda de la Constitución de Estados Unidos, presupone necesariamente la libertad de identificar las personas que constituyen esa asociación como **"miembros afiliados"** y limitarla a esas personas solamente.  Tal derecho resultaría en una garantía hueca o vacía si los partidos políticos no pudieran decidir con quienes comparten sus intereses, y podrían persuadir al electorado sobre sus principios.  Los partidos políticos tienen el derecho, como parte de su libertad de asociación, a protegerse contra la penetración de personas en sus procesos internos que pretenden presentarse al electorado con su insignia cuando postulan principios políticos adversos a los de esa colectividad.  Los partidos políticos tienen el derecho y la prerrogativa de determinar quién es **"miembro afiliado"** dentro de esa colectividad.  <u>Democratic Party of the United States v. Wisconsin</u>, 101 S.Ct. 1010, 1019 (1981).

*Efraín E. Rivera Pérez*
*Juez Asociado*